# FRANK v. UNITED STATES (two cases).

## Nos. 1288, 1289.

District Court, E. D. Pennsylvania.

May 6, 1942.

Wolf, Block, Schorr & Solis-Cohen, of Philadelphia, Pa. (Nathan Silberstein, of Philadelphia, Pa., of counsel), for plaintiffs.

Gerald A. Gleeson, U. S. Atty., of Philadelphia, Pa. (Thomas J. Curtin, Asst. U. S. Atty., of Philadelphia, Pa., Samuel O. Clark, Jr., Asst. Atty. Gen., and Andrew D. Sharpe and Leon F. Cooper, Sp. Assts. to Atty. Gen., of counsel), for the United States.

KALODNER, District Judge.

These are actions (consolidated) for the recovery by plaintiffs (brothers) of alleged overpayment of income taxes for the years 1937 and 1938.

A jury trial was waived, and the case was heard before the court on the pleadings and stipulation of facts without additional testimony.

The plaintiffs, while solvent, purchased at less than face value their own obliga- tions in connection with a real estate transaction under the circumstances set forth in the Findings of Fact.

The government contended that in doing so they realized taxable income during the years 1937 and 1938 when the obligations were purchased at a discount, under Section 22[1] of the Revenue Act of 1936, c. 690, 49 Stat. 1648, 26 U.S.C.A. Int.Rev.Acts, page 825, and Article 22(a)-14[2] of Treasury Regulations 94, promulgated under the Revenue Act of 1936.

### Findings of Fact.

The stipulated statement of facts, which is hereby adopted as the Findings of Fact of this court, is as follows:

I. In June, 1926, the plaintiffs, who were brothers, and another brother, Samuel Frank, purchased real estate known as 414–22 S. 16th Street, Philadelphia, Pennsylvania, from Herman Collins and Gertrude, his wife, at a cost of $108,000 —$43,500 of which was represented by a purchase money mortgage secured by the property. Title to the property was taken in the name of Max Frank on behalf of himself and his brothers.

II. The building which was on the property aforesaid was razed and a new garage building was erected on the site at a cost of $130,000 and completed in May, 1927.

III. On May 10, 1927, Max Frank, who held legal title to the property, borrowed the sum of $110,000 giving the property as security for payment under a first mortgage, there being 110 first mortgage notes for $1,000 face value each, dated May 10, 1927, all maturing three years after date, or on May 10, 1930. Max Frank was the maker of these notes which were called "bonds" and the Philadelphia Company for Guaranteeing Mortgages, Trustee, was the payee and mortgagee. Thereafter the bonds were sold to the general public.

Of the sum of $110,000 borrowed as aforesaid, there were made the following disbursements at the time of the Title

---

[1] "§ 22. Gross Income

"(a) *General Definition.* 'Gross income' includes gain, profits, and income derived * * * from any source whatever."

[2] "Art. 22(a)-14. *Cancellation of Indebtedness.*—The cancellation of indebtedness, in whole or in part, may result in the realization of income. * * * *A taxpayer realizes income by the payment or purchase of his obligations at less than their face value.* (See article 22(a)-18) * * *" (Emphasis supplied.)

Company's settlement between the parties to the loan:

| | |
|---|---:|
| To Herman Collins and wife, in satisfaction of purchase money mortgage and interest thereon | $44,619.30 |
| To J. M. Rosenberg, final installment due on account of building contract | 19,000.00 |
| To Philadelphia Company for Guaranteeing Mortgages, fee for guaranteeing mortgage | 3,850.00 |
| Taxes | 1,987.50 |
| Water rent | 28.75 |
| Boiler insurance | 152.70 |
| Title Company charges for mechanic's lien insurance, title insurance, etc. | 1,063.00 |
| Miscellaneous recording charges, etc. | 27.00 |
| To Max Frank | 39,271.75 |

IV. Subsequently Samuel Frank died and his estate relinquished any claim of title to the property because the decedent had not contributed anything toward the purchase price of it.

V. On or about May 1, 1930, which was a few days before the bonds representing the $110,000 mortgage loan became due, an agreement was entered into between Max Frank and Manuel A. Frank on the one hand and the trustee representing the bondholders on the other, whereby Max Frank and Manuel A. Frank, the plaintiffs herein, assumed personal liability for the payment of the bonds in consideration of the extension of the maturity date. Under this agreement the due date of some of the bonds was extended for one year, some for two years, and others for three years. No extension of the due date beyond May 10, 1933, was granted for any bond, however, under this agreement.

VI. On January 1, 1937, 105 of the bonds, representing $105,000 of the mortgage loan, were outstanding and unpaid and the plaintiffs were personally liable for payment.

VII. During the year 1937 plaintiffs purchased through straw parties and retired $20,000 face amount of the bonds above mentioned and paid for the same the sum of $11,410 or $8,590 less than the face amount of the bonds so purchased. During the year 1938 the plaintiffs purchased through straw parties and retired $85,000 face amount of the bonds above mentioned and paid for the same the sum of $57,847.23 which includes the cost of acquisition, or $27,152.77 less than the face amount of the bonds so purchased. Max Frank and Manuel A. Frank were solvent throughout the years 1937 and 1938, even though their respective personal obligations on the bonds aforesaid are included in their liabilities. The real estate was not disposed of and still is owned by the plaintiffs.

VIII. It is agreed that witnesses who would be called by the plaintiffs would testify that the fair market value of the real estate and improvements in 1937 and 1938 was $55,000 and that the witnesses who would be called by the defendant would testify that the fair market value of the real estate and improvements at that time was $65,000.

IX. The plaintiffs were allowed depreciation of $2,600 per year upon the garage building, upon the cost basis of $130,000 and at the end of the year 1938 had received total depreciation allowances for income tax purposes of $33,800, so that the depreciated cost value of the building was $96,200.

X. Each of the plaintiffs filed an individual income tax return for the years 1937 on March 15, 1938, and for 1938 on March 15, 1939. In the return of Max Frank for the year 1937, he reported tax liability in the amount of $3,229.90 of which $413.74 was later abated for reasons not involved in this action. In the return of Manuel A. Frank for the year 1937, he reported tax liability of $8,548.16 of which $547.07 was later abated for reasons not involved in this action. In the return of Max Frank for the year 1938, he reported tax liability of $8,638.54 and in the return of Manuel A. Frank for the year 1938 he reported tax liability of $8,366.27. Max Frank and Manuel A. Frank duly paid the tax liabilities above mentioned, less the amounts abated as aforesaid. In their returns for the year 1937, each of the plaintiffs included one-half of a portion of the difference between the face amount of the bonds acquired in that year and the amount paid to acquire the same, in taxable income. In the year 1938 neither of the plaintiffs included as part of their taxable income any part of the difference between the face amount of the bonds acquired in that year and the amount paid to acquire the same.

XI. The Commissioner of Internal Revenue ruled and determined that the entire difference between the face value of the bonds and the amount paid by the plaintiffs to purchase and retire them in 1937 and 1938 was taxable income to the plaintiffs, and, as a result there was in-

cluded in the taxable income of Max Frank for the year 1937 one-half of the $8,590 or $4,295 and in the taxable income of Manuel A. Frank for the year 1937 the other one-half of the said sum of $8,590, or $4,295. Under the Commissioner's determination there was included in the taxable income of Max Frank for the year 1938 one-half of the sum of $27,152.77 or $13,576.38 and a similar amount in the taxable income of Manuel A. Frank for the year 1938. There were other adjustments in the taxable income of the plaintiffs which the Commissioner made, but these other adjustments are not involved, nor are they of importance, in the present actions. As a result of all of the adjustments made by the Commissioner in the taxable income of the plaintiffs, the Commissioner assessed Max Frank with additional income tax for the year 1937 in the amount of $805.96 and in the year 1938 in the amount of $4,578.07 and assessed Manuel A. Frank with additional income tax for the year 1937 in the amount of $1,838.12 and for the year 1938 in the amount of $4,622.13. On August 21, 1939, Max Frank paid the additional tax assessed against him for the years 1937 and 1938 aforesaid, $5,384.03 together with interest in the sum of $188.24 and on the same date Manuel A. Frank paid the additional tax assessed against him as aforesaid, $6,460.25 together with interest in the amount of $278.12.

XII. On or about November 10, 1939, each of the plaintiffs filed a claim for refund for the years 1937 and 1938 upon the ground that the difference between the face value of the bonds and the amount paid by them to purchase and retire them was not income to the plaintiffs but instead merely reduced the cost of the property. The claims for refund have not been acted on by the Commissioner of Internal Revenue but more than six months expired since their filing prior to the institution of these actions.

XIII. It is agreed that Max Frank, if called as a witness for the plaintiffs, would testify as follows:

In June, 1926, Sam Frank, who was in the real estate business, proposed to Max Frank and Manuel A. Frank the purchase of premises 414–22 S. 16th Street, Philadelphia, the demolition of the buildings then erected thereon, and the construction of a garage building, the cost of construction to be financed by a construction mortgage which would be replaced by a permanent mortgage when the garage building was completed. Due to the high costs of obtaining a construction mortgage, the parties abandoned the idea and Max Frank and Manuel A. Frank then agreed to advance the costs of construction and to reimburse themselves from the permanent mortgage to be placed thereon when the garage building was completed, to the extent that the mortgage monies were not otherwise applied.

The sum of $39,271.75 shown to have been paid to Max Frank under paragraph III was divided between Max Frank and Manuel A. Frank in reimbursement of monies advanced by them for the construction of the garage building completed in May, 1927.

### Discussion.

The plaintiffs' contention, stated in pp. 1 and 2 of their reply brief, is as follows:

" * * * It is the plaintiffs' position that the acquisition of the land, the plan to improve the same through the medium of a purchase money mortgage, the demolition of the buildings on the land and the building of a new garage, the placing of a mortgage to reimburse the plaintiffs for the monies outlaid in the course of building and to refinance the purchase money mortgage, and the satisfaction of the mortgage are all integral parts of one and the same transaction and all of them should be related to the original purchase of the land. It is also their position that ultimate profit and loss on this transaction should await the final disposition of the property involved * * *."

The defendant's position, briefly stated, is: There was no relationship between the purchase of the property in 1926 and the borrowing of the $110,000 in 1927; that the latter loan was not a purchase money mortgage, and that the mortgagee in that transaction was not the seller nor anyone in privity with the seller; that with respect to the acquisition of the notes securing the $110,000 loan at a discount 11 years later, the negotiations were neither with the seller nor the original mortgagee, but with others who had purchased the notes and were then their holders.

In advancing their contention, plaintiffs concede that the general rule is that a

taxpayer realizes income by the payment or purchase of his obligations at less than face value. United States v. Kirby Lumber Co., 1931, 284 U.S. 1, 52 S.Ct. 4, 76 L.Ed. 131; Helvering v. American Chicle Co., 1934, 291 U.S. 426, 54 S.Ct. 460, 78 L.Ed. 891.

Plaintiffs rely on Bowers v. Kerbaugh-Empire Co., 1926, 271 U.S. 170, 46 S.Ct. 449, 70 L.Ed. 886; Hirsch v. Commissioner of Internal Revenue, 7 Cir., 115 F.2d 656; Hextell et al. v. Huston, Collector of Internal Revenue, D.C., 28 F.Supp. 521, and A. L. Killian Co. v. Commissioner, 44 B.T.A. 169.

Bowers v. Kerbaugh-Empire Co., supra, clearly is not applicable in the instant situation. In the Bowers case, as was pointed out by the Supreme Court of the United States in the American Chicle Co. case, supra, at page 430 of 291 U.S., at page 461 of 54 S.Ct., 78 L.Ed. 891: "The final outcome of the dealings was revealed—the taxpayer suffered a loss." Here the property is still owned by the plaintiffs and there has been no "final outcome".

As to the other cases cited by the plaintiff: In my opinion, they cannot be reconciled with the general rule enunciated by the Supreme Court in the Kirby Lumber Co. and American Chicle Co. cases, supra. They do not come within the scope of the Bowers case, because there was no "final outcome" disclosing a loss to the taxpayer.

In the Hirsch[3] and Killian Co.[4] cases, supra, the taxpayer, a property owner, compromised a mortgage obligation for less than face value. The ruling in each case was that such reduction did not constitute income, but was merely a "reduction" in the original purchase price of the mortgaged property.

It may here be noted that there is an appeal pending in the 8th Circuit from the decision by the Board of Tax Appeals in the Killian Co. case in favor of the taxpayer.

In the Hextell case, the taxpayer purchased a tract of land for $20,000 in 1918, paying $10,000 in cash. He raised the remaining $10,000 by giving a note secured by a mortgage on the land to an insurance company. In 1935, when the land had a value of $6,500, he satisfied the mortgage by payment of that amount. The court held that the difference did not constitute "taxable income" on the novel theory that the "gain" to the taxpayer on the adjustment of the mortgage indebtedness was offset by the "loss * * * in capital value" [28 F.Supp. 523], determined at the time the purchase money mortgage was refinanced.

As previously stated, in none of these cases had the property owner disposed of his property so as to come within the scope of the Bowers decision.

Any discussion of the rationale of the Hirsch, Hextell and Killian Co. decisions is, however, academic, inasmuch as the facts in the instant case are entirely different than the facts in those cases. Here, the plaintiffs bought a property in 1926 from one Collins for $108,000, of which $43,500 was represented by a purchase money mortgage. They then proceeded to construct a new building on the site at a cost of $130,000. When the new structure was completed in 1927, they borrowed $110,000 and gave a mortgage on the property as security. Out of this $110,000 they paid off the original mortgage of $43,500 plus accrued interest. Further, they paid $19,000 to the contractor as the final installment due on the construction job; and, after paying various other set-

---

[3] In the Hirsch case, the taxpayer purchased a property in 1928 for $29,000, paying $10,000 in cash and assuming a mortgage indebtedness of $19,000. In 1936, the mortgage having been reduced by payments on account to $15,000, the taxpayer obtained satisfaction of the mortgage by payment of $8,000, the then market value of the property.

The court held that the $7,000 difference between the face amount of the mortgage and the $8,000 paid in satisfaction of the mortgage was not "income" on the ground that the taxpayer "received 'nothing of exchangeable value'; he received a credit upon the cost of a

capital investment; he merely entered into a transaction whereby he procured decrease in his capital loss" 115 F.2d page 658.

[4] In the Killian case, the taxpayer had given a purchase money mortgage for $80,000, and later satisfied this mortgage by a payment of $5,000 in cash and a new mortgage for $55,000. The Board of Tax Appeals held that since the fair market value of the property at the time of refinancing was not in excess of $60,000, the transaction was to be treated as a reduction in the basic cost of the property.

tlement and financing costs, they had a balance of $39,271.75, which they pocketed as a reduction in their outlay on the new building.

It must be kept in mind that those who lent the $110,000 to the plaintiffs in 1927 were not those who sold the property to them in 1926.

On May 1, 1930—a few days before the $110,000 mortgage became due (there being 110 first mortgage bonds for $1,000 face value each, dated May 10, 1927 and maturing May 10, 1930)—*the plaintiffs, in consideration for an extension of the maturity date of the bonds, entered into an agreement assuming personal liability for their payment.* The extension agreement was entered into with the trustee representing the bond holders—members of the general public who had purchased the bonds from the Philadelphia Company for Guaranteeing Mortgages, which had made the $110,000 mortgage loan in 1927.

In granting the extension, the holders of the bonds, in effect, loaned the plaintiffs for the extended term the $110,000 about to become due, in consideration of the plaintiffs' assumption of personal liability for the payment thereof.

The stipulation of facts discloses that on January 1, 1937, 105 of the bonds, representing $105,000 of the mortgage loan, were outstanding and unpaid—*and the plaintiffs were personally liable for their payment,* in accordance with their undertaking in the extension agreement of May 1, 1930. It was during the year 1937 that plaintiffs, acting through straw parties, retired $20,000 face amount of the bonds by paying $11,410—or a discount of $8,590. During 1938, again acting through straw parties, the plaintiffs purchased $85,000 of the bonds for the sum of $57,847.23—or a discount of $27,152.77.

It is important to remember that during 1937 and 1938, when these transactions took place, *that the plaintiffs were solvent,* even though their respective personal obligations on the bonds were included in their liabilities.

In summary then, the net result of the repurchase transactions during 1937 and 1938 was that the plaintiffs paid off an obligation of $105,000 by an outlay of $69,257.23—or a saving of $35,742.77.

It is clear that this satisfaction of an indebtedness of $105,000 by the payment of approximately $69,000 was not such a "reduction in purchase price" of the property discussed in the Hirsch and Killian Co. cases.

On January 1, 1937, there existed two separate and distinct liabilities, each independent of the other.

The first liability was that of the plaintiff, Max Frank, who held legal title to the property, and who had executed in 1927 the $110,000 mortgage on the property and the 110 separate $1,000 mortgage bonds. Max Frank was legally liable on these $110,000 bonds—and, of course, the mortgage property was liable as collateral.

The other plaintiff, Manuel A. Frank, was not liable on these bonds to their holders, whatever his liability might have been to his brother, Max, the obligor, as a result of their gentlemen's agreement or partnership undertaking.

We have then this situation: that arising out of the original $110,000 mortgage loan, Max Frank and the property itself were liable.

The second independent and distinct liability of both Max Frank and Manuel A. Frank came into being when the two signed the extension agreement of May 1, 1930. As a legal consequence of their execution of this extension agreement, the two Franks then became personally liable for the retirement of these $110,000 of mortgage bonds—and this liability was entirely independent of any prior liability of either Max Frank or the mortgaged property. The holders of the bonds, under this extension agreement, had the legal right, upon failure of Max and Manuel to retire the bonds upon their extended dates, to seek recourse against any property, real or personal, which they owned. It is admitted that the plaintiffs were both solvent in 1937 and 1938 when they retired their $105,000 indebtedness by payment of approximately $69,000—or a saving of close to $36,000. Thus, when they retired this $105,000 of indebtedness by payment of $69,000, paraphrasing the language in the Kirby Lumber Co. case, as a result of their dealings they made available $35,742.77 assets previously offset by the obligation of the bonds which they retired. In doing so they "realized within the year an accession to income, if we take words in their plain popular meaning, as they should be taken". United States v. Kirby Lumber Co., at page 3 of 284 U.S., at page 4 of 52 S.Ct., 76 L.Ed. 131. See, also, Commissioner of Internal Revenue, v. Coastwise Transportation

Corp., 1 Cir., 71 F.2d 104, 105, 106. The result of the transaction in the instant case was, as stated in the Coastwise Transportation Corp. case, that "the liabilities of the taxpayer were diminished without a diminution of the assets".

Finally, it seems to me that the situation here is strongly analogous to that in the American Chicle Co. case. There the taxpayer in 1914 purchased the assets of the Sen-Sen Chiclet Co., and in connection with such purchase assumed more than $2,000,000 of its outstanding bonds. During 1922, 1924 and 1925 it purchased a considerable number of these bonds in the market at less than their face value. The Commissioner assessed the difference between the face value and the price paid for the bonds as "income".

The Board of Tax Appeals reversed the Commissioner. It did so on the same theory that the plaintiffs have advanced in this case—that by purchasing the bonds at a discount, the American Chicle Co. simply reduced the purchase price of the Sen-Sen Company's property. "Whatever the total amount paid to retire the bonds," said the Board of Tax Appeals at page 429 of 291 U.S., at page 460 of 54 S.Ct., 78 L.Ed. 891, "it will constitute a part of the cost to petitioner of the Sen-Sen Chiclet Co. assets."

The Circuit Court of Appeals of the Second Circuit supported the view of the Board of Tax Appeals (65 F.2d 454, 455). In doing so it drew a distinction "between obligations whose consideration is money, and those issued or assumed for property which the obligor still holds."

Said the Circuit: "* * * The gain must be 'realized,' either by a sale of the property for money, or by its exchange for something else. Section 935, title 26, U.S. Code (26 U.S.C.A. § 935 [26 U.S.C.A. Int.Rev.Acts, page 204]). When a taxpayer gets money by issuing an obligation which he later discharges for less than its face, the transaction is completed, because money need not be sold or exchanged to be 'realized.' So we read United States v. Kirby Lumber Co., supra, 284 U.S. 1, 52 S.Ct. 4, 76 L.Ed. 131. But if he buys property by an obligation in the form of a bond, note, or the like, and if it remains in kind after the debt is paid, there can be no 'gain.' The cost has indeed been definitively settled, but that is only one term of the equation; as long as the other remains at large, there is no 'realized' gain."

Again, it will be noted that the Circuit Court subscribed to exactly the same theory advanced by the plaintiffs in this case. The Supreme Court, however, in discussing the rulings by the Board of Tax Appeals and the Circuit Court, specifically rejected them as erroneous and sustained the original ruling by the Commissioner that "income" was realized by the American Chicle Co. in the retirement at a discount of the assumed obligations of the Sen-Sen Co.

Here the plaintiffs, under the extension agreement of May 1, 1930, assumed the obligations of the plaintiff Max Frank with respect to the $110,000 mortgage. While it may be argued that at the time of the execution of the extension agreement the liability was merely contingent, it cannot be questioned that the liability became fixed when the bonds were not paid when they matured under the terms of the extension agreement. Admittedly, on January 1, 1937, when $105,000 of the bonds were outstanding, unpaid and past due, the plaintiffs were personally liable for the payment (paragraph VI of the Stipulation), and in 1937 and 1938, during the period when the bonds were acquired at a discount and retired, prior to their acquisition they were included in the liabilities of the plaintiffs (paragraph VII of the Stipulation). When the bonds were purchased at a discount and retired, then, as was stated in the American Chicle Co. case, at page 431 of 291 U.S., at page 461 of 54 S.Ct., 78 L.Ed. 891, the plaintiffs' "books indicated a decrease of liabilities with corresponding increase of net assets."

That "decrease of liabilities with corresponding increase of net assets", under the decisions, constitutes taxable income. See, also, Haden Co. v. Commissioner, 5 Cir., 118 F.2d 285.

Accordingly, the plaintiffs' claim must be denied and judgment rendered in favor of the defendant.

In view of the foregoing, in addition to the stipulated facts, the court makes the following

### Special Findings of Fact.

XIV. During the years 1937 and 1938 the fair market value of the mortgaged real estate and improvements owned by the plaintiffs was not in excess of $65,000.

XV. The purchase by the plaintiffs in June, 1926 of premises 414–22 S. 16th

Street, Philadelphia, as set forth in paragraph I above, was a single and separate transaction.

XVI. The razing of the building on said premises and construction of a new garage building thereon, as set forth in paragraph II above, was a single transaction separate from the purchase of the property in June, 1926.

XVII. The borrowing by the plaintiff, Max Frank—who held legal title to the property—of the sum of $110,000 on May 10, 1927 was a separate transaction, as set forth in paragraph III above.

XVIII. The agreement entered into between Max Frank and Manuel A. Frank, and the trustees representing the bondholders, whereby the two Franks assumed personal liability for the payment of the $110,000 loan obligations in consideration of the extension of the maturity date, as set forth in paragraph V above, was a separate transaction.

XIX. The purchase by the plaintiffs in 1937 and 1938 of the $105,000 bonds was in release and satisfaction of their liability created by the extension agreement of May 1, 1930.

### Conclusions of Law.

On the facts found I conclude as a matter of law:

I. The plaintiffs were liable, personally, for the payment of the indebtedness of $105,000, which was due and owing on January 1, 1937.

II. Since all of plaintiffs' property was subject to the payment of plaintiffs' debts, and the plaintiffs were solvent, when they purchased, or paid, their obligation of $105,000 by the payment of only $69,257.-23, there was $35,742.77 of their liabilities which was extinguished without any decrease in their assets, and $35,742.77 of their assets thereby freed from a like amount of indebtedness. The $35,742.77, therefore, was taxable income of plaintiffs.

III. Since they were solvent at the time, the purchases by the plaintiffs in 1937 of their own obligations of the face value of $20,000 for the sum of $11,410 resulted in taxable income upon those transactions in that year in the amount of $8,590, of which one-half, or $4,295, was taxable income of each of the plaintiffs herein for that year.

IV. Since they were solvent at the time, the purchases by the plaintiffs in 1938 of their own obligations of the face value of $85,000 for the sum of $57,847.23 resulted in taxable income upon those transactions in that year in the amount of $27,152.77, of which one-half, or $13,576.-38, was taxable income of each of the plaintiffs herein for that year.

V. The Commissioner of Internal Revenue has correctly determined and assessed the plaintiffs' income taxes for the years 1937 and 1938, and the plaintiffs have not overpaid their income taxes for those years.

VI. The income taxes sought to be recovered in these actions were properly, correctly and lawfully determined and assessed by the Commissioner of Internal Revenue, and legally collected from the plaintiffs and, by reason thereof, the plaintiffs' complaints must be dismissed at the plaintiffs' costs.

VII. On the facts and the law, the judgment of the court must be against the plaintiffs and in favor of the defendant herein.

An order for judgment may be submitted in accordance with this opinion.